540   THE PEOPLE ex rel. VAN WYCK v. WHEELER.

First Department, September Term, 1879

PEOPLE OF THE STATE OF NEW YORK ex rel. ROBERT A. VAN WYCK and others, v. DE WITT C. WHEELER, STEPHEN B. FRENCH, CHARLES F. MACLEAN AND JAMES E. MORRISON.

*Inspectors of election in New York — are under sect. 13 of chap. 675 of 1872 to be chosen from the two great parties each as an entirely, without regard to subordinate factions — subordinate factions in a party, how represented — Failure to appoint within the time specified will not disfranchise the city at the ensuing election — when a mandamus will issue to compel an appointment.*

Section 13 of chapter 675 of 1872, in relation to elections in the city of New York, provides that all inspectors of election and poll clerks in said city shall be appointed by the board of police. It then provides that "it shall be the duty of the said board of police in the months of August and September * * * in each succeeding year, for each election district in, said city and county, to select to serve as inspectors of election, four persons (two of whom, on State issues, shall be of different political faith and opinions from their associates, and those appointed to represent the party in political minority on State issues in the said city and county, to be named solely by such commissioner, or such of the "commissioners of police" in said board as are the representatives of such political minority), who" shall have certain qualifications prescribed by the statute. There exist a republican organization and two democratic organizations — the Tammany Hall democracy and the Irving Hall democracy — in the city of New York. On September 26, 1879, an order was made, returnable at a General Term to be held on September 29, 1879, requiring the board of police commissioners to show cause why a *mandamus* should not issue compelling them to select, as inspectors of elections, certain persons named by the Tammany Hall democratic organization of the city of New York, or other persons belonging to such organization.

*Held,* that it was the duty of the board to take into consideration only the two dominant political parties into which the people of the State were divided — parties organized and acting on broad State issues — without regard to subordinate or inferior organizations or factions, whether belonging partially or wholly to either of the great parties, or entirely independent of them; that the board should not look solely to that portion of either of the two parties which supported the entire State ticket and should not exclude from consideration a portion of either party which, under a local organization, rejected a single one of the candidates nominated by the State convention.

That the application for a mandamus should be denied as premature, for the reason that the board might appoint inspectors at any time before October first.

*Semble,* that the failure of the board to appoint inspectors before October first would not operate to disfranchise the city of New York at the election to be held in the November following, but that the court would, at any time after

October first, entertain an application for a *mandamus* returnable *instanter* to compel the board to make such appointments.

———————◇———————

On October 1, 1879, an order was made, returnable on October second at General Term, requiring the respondents the board of police commissioners of the city of New York to proceed with and complete their appointment of inspectors. At the hearing it appeared that there had been submitted to the board three lists of the names of persons, asserted to be qualified to act as inspectors, one being submitted by the republican organization in the city of New York, one by the democratic organization in the city of New York known as the Tammany Hall democracy, and the third by the democratic organization in the city of New York known as the Irving Hall or anti-Tammany Democracy. The republican party was in a political minority in the city of New York. The anti-Tammany or Irving Hall democracy supported all the candidates nominated by the regular democratic State convention at Syracuse. The Tammany Hall democracy supported all the said candidates except the candidate for governor, for which office they supported another person. It further appeared that at the last previous election the electors represented, by the republican organization, numbered about 51,000, those represented by the Tammany Hall organization about 60,000, and those by the Irving Hall democracy about 29,000. Two inspectors of election for each district had been selected by the police board from the list submitted by the republican organization, and one inspector for each district from the list submitted by the Irving Hall democracy. Two of the members of the board claimed that the remaining inspectors should be taken from the list submitted by Tammany Hall, and the other two that they should be taken from the list submitted by the Irving Hall democracy.

*Held*, that a *mandamus* should issue compelling the remaining inspectors to be selected from the Tammany Hall democracy.

APPLICATION for a *mandamus* to compel the board of police of the city of New York to appoint certain persons as inspectors of election, under section 13 of chapter 675 of 1872.

That section is as follows :

" § 13. All inspectors of election and poll-clerks, in the city and county of New York, shall hereafter be selected and appointed by the board of police, who shall also have power to make all necessary removals and transfers, and fill all vacancies which may, from any cause, arise. It shall be the duty of the said board of police in the months of August and September, in the year one thousand eight hundred and seventy-two, and annually in the months of August and September in each succeeding year, for each election district in said city and county, to select to serve as inspectors of election, four persons (two of whom, on State issues, shall be of different political faith and opinions from their associates, and

those appointed to represent the party in political minority on State issues in the said city and county to be named solely by such commissioner, or such of the "commissioners of police" in said board as are the representatives of such political minority), who shall be citizens of the United States and of the State of New York, of good character, and able to read, write and speak the English language understandingly, qualified voters in said city and county, and not candidates for any office to be voted for by the electors of the district for which they shall be selected; but no person shall be required to be a resident or voter in the election district for which he shall be appointed an inspector."

It appeared that three lists of proposed inspectors of election had been submitted to the police board, one by the republican organization in the city of New York, one by the democratic organization in the said city known as the Tammany Hall democracy, and the third by the democratic organization in the said city known as the Irving Hall or anti-Tammany democracy. The two latter organizations supported all the candidates for State offices nominated at the State convention except the nominee for governor. The Irving Hall democracy supported the nominee of the State convention, Lucius Robinson, and the Tammany Hall organization supported John Kelly therefor. It appeared that at the last election the number of electors represented by the republican organization was 51,000, the number represented by Tammany Hall about 60,000, and the number represented by Irving Hall about 29,000.

On September 26, 1879, upon the application of the relator, a committee acting in behalf of Tammany Hall, an order was made by Mr. Justice Westbrook, returnable on September twenty-ninth, at a General Term to be held in the court house in New York, requiring the board of police, the respondents, in the words following, to show cause why they should not " be compelled forthwith to appoint as inspectors of election in the city of New York, for the year 1879, the persons named as qualified for such inspectors by the regular democratic republican organization, commonly known as the Tammany Hall democracy, or other persons belonging to said organization, and having the same political faith and opinions and who possess the qualifications required by law for inspectors of election, or why a writ of *mandamus* should not issue directed to

them in the usual form and requiring them to do the acts afore-said, or why such other or further writ or order should not be issued as may be just, and in the meantime, until the hearing and determination of this matter, the said police commissioners and said board of police are enjoined and restrained from appointing any other persons inspectors of election than those belonging to the regular republican party of the State of New York, or to the regular democratic republican party, as represented by the organization known as the Tammany Hall democracy."

On September twenty-seventh it was ordered by Mr. Justice WESTBROOK " that so much of the prior order of September 26, 1879, as restrains and enjoins the police commissioners and the board of police from appointing inspectors of election and poll-clerks for the city and county of New York, in pursuance of and in accordance with the requirement of section 13 of chapter 675 of the Laws of 1872, is vacated, and said order is modified, so as to require the board of police to show cause at the time and place, and before the tribunal specified in such prior order, why they should not be compelled to select such inspectors as said act requires, and whether or not the persons referred to in said prior order are the persons who should be appointed."

*D. D. Field* and *E. W. Stoughton*, for the relators.

*F. Lynde Stetson* and *J. N. Bangs*, for the respondents.

*Elihu Root*, for the respondents, French and Wheeler.

After hearing the arguments of counsel and due deliberation, the court, by DAVIS, P. J., delivered the following oral opinion:

" The court has reached a conclusion in this case which, under its peculiar exigencies, it feels bound to announce at this time without occupying any time in writing an opinion. The statute under which the question is presented to the court, in its thirteenth section, has special relation to a system intended to protect the rights of minorities. It was adopted at a time when, as now, the people of the State and of this city were divided into two dominant political parties. It was intended to take into consideration those two

**544 THE PEOPLE ex rel. VAN WYCK v. WHEELER.**

FIRST DEPARTMENT, SEPTEMBER TERM, 1879.

parties without respect to subordinate or inferior organizations or factions, either partially or wholly belonging to either of the great parties, or independent in themselves. Regarding these two great parties, it assumed, what would ordinarily be the case, that one or the other of them would have a majority in this city, and consequently control of the body authorized to appoint the inspectors of election, to wit, the Board of commissioners of police. With that view, and, of course, without special regard to the party that might at any time be in power, it provides for the protection of the minority party, by securing to it an almost absolute power of choosing for itself one-half of each board of inspectors of election; hence the act provides (and of course its operation would be the same whether the democratic party retained or lost its power; whether the republican party continued to be a minority or became a majority) that the board of commissioners, however composed, shall, in selecting inspectors of election, select four persons for each election district. It recognizes the right of the minority party in the city, distinguished by its relation to State issues, to have one-half of each board; and, therefore, it declares that of the four persons selected, two of them on State issues shall be of different political faith and opinions from their associates, and those appointed to represent the party in political minority on State issues in said city and county shall be named solely by such commissioners of police as are the representatives of such political minority. It prescribes the qualifications that all the inspectors of election shall possess, and in a case where the commissioners who represent the minority have agreed upon two inspectors in each election district, the only question left to the board is to determine whether or not the two thus selected have the qualifications prescribed by the act; that is to say, whether they are citizens of the United States and of the State of New York, are persons of good character, are able to read, write and speak the English language intelligently, are qualified voters in the city and county, and are not candidates for any office to be voted for by the people in the election district for which they are selected.

When these qualifications are ascertained to the satisfaction of the board to exist, then the obligation to appoint the person

selected by the minority becomes imperative, and it is the duty of the board to make the appointment of the two thus selected as inspectors.

Upon this question the counsel in the case have substantially agreed, but the main and important question here, arises upon the construction of the act as it affects the majority party. The act assumes and proceeds upon the general idea, that the majority party will take care of itself and be able to do so by having possession of power. It, therefore, does not adopt the same language in respect to the selection of inspectors who shall represent the majority, but it assumes inferentially and proceeds upon the idea that the two who are to be selected must be selected by the board from the majority party.

Now the question that arises upon that fair and just inference of the law is, what is meant by the majority party from which this selection is to be made? Was it intended that the majority party may be any local party formed for the purpose of local elections? Undoubtedly not; because the test adopted by the act for the purpose of determining what shall be considered the minority party has a far broader scope, and has, in fact, no reference to mere local questions. It describes a party organized and acting upon broad State issues; in other words, a State party having relations throughout the whole political organization known as the State of New York. And, undoubtedly, the act intends, with reference to the majority party, to keep up the same basis or standard for the selection of the representatives of that party : to wit, an organization having affiliations and relations politically throughout the great political division known by the name of the State of New York. From that view it would follow that when the commissioners of the board of police come to perform their duty under the act they are to look upon the democratic party, located in the city as to the residence of its members, in its relation to the whole party as an organization throughout the State, and to keep in view those relations and to look upon the organization and membership of that party, not as a local body but as a general party organization.

Now, in this case it seems to us, that the commissioners have fallen into an error in supposing that in selecting inspectors from

the democratic party, they may look solely at that portion of the party which, in the city of New York, supports the entire democratic ticket. That is to say, they exclude, as not entitled to consideration in selecting the board of inspectors, that great body of democrats who, under one local organization, see fit to reject a single one of the nominees of the party in the State, while they retain their relations to State issues and support all the other nominees upon the State ticket.

The effect of such a view would be, if practically carried out, that if every democrat in the city of New York were to retain affiliation with Tammany Hall, and to declare that, for personal reasons, he would not vote for the nominee of the democratic convention for governor, there would be no body of democrats in the city representing a majority from whom any inspectors could be selected. If all the democrats of the city should join the Tammany Hall organization, in its determination not to vote for Governor Robinson, so that not one man could be found who intended to vote for him, there would be no party from which could be selected any inspector. Although the whole body on " State issues " and the rest of the ticket retained affiliation with the democratic party of the State. It would follow also, if that view be correct, that if out of 90,000 democratic voters of the city of New York only two men in each election district could be found who intended to vote for the nominee for governor of the Syracuse convention, and all the rest intended to vote against him for their personal reasons, in that case those two would alone constitute a majority party from which a selection could be made, and they would virtually, by adhesion to the nomination of Governor Robinson, appoint themselves to the place of inspectors. That, in our judgment, is not the policy or construction of the law.

The duty of the commissioners in making this selection is to look upon the democratic party of this city as an entirety; they have no right, as we think, to say: "We will reject Tammany Hall and its followers from all consideration because they do not support the nomination of Governor Robinson," and they would have no right to reject Irving Hall from all consideration, because it may not support the regular democratic nominees for local offices. On the contrary, the policy of the law

requires the board of police to look at the democratic party with a view to its relations to State issues, as a general organization and as a whole, and select from it, without respect to local divisions, temporary or permanent, competent and proper men to perform the duty of inspectors. So that the board was in error when it undertook to say that Tammany Hall, its followers and supporters shall have no consideration in selecting suitable men for the office of inspector ; but it should have taken the whole body of the democratic party viewed as a State, and not as a county party, and have passed upon the merits of such fit men as the board might find in connection with that whole body — whether of Tammany Hall or Irving Hall, or what not ; and, without choosing proper men in that way the commissioners would not, in our judgment, perform the duty imposed upon them by law. It seems quite clear, from the papers before us, that they have fallen into a mistake — a part of the board, at least — in supposing that the selection was to be made from one local organization voting the entire State ticket, excluding another organization who reject one of the nominees on that ticket. The mere fact that, for personal reasons, a large body of democrats may see fit to vote for some one else for governor than the regular nominee does not, in our judgment, determine the question whether or not they are any longer to be considered democrats and as such entitled to the respectful consideration which the law requires to be given to the whole body of that great party.

But, while presenting these general considerations, which we hope will have some possible effect on the action of the board, we are obliged to determine this application on other grounds. In the first place, it is proper for the court to say that it is quite a mistake to suppose that the failure of the board of commissioners to appoint the inspectors before the first of October will operate to disfranchise the city of New York. The board of police is an administrative body of officers empowered to discharge certain functions under the law. It is their duty to perform those functions. The law has fixed the time within which that duty shall be completely executed. But it is a universal principle of law that where a right of the people is concerned, the failure of administrative officers to perform their duties within a prescribed time shall

548 THE PEOPLE ex rel. VAN WYCK v. WHEELER.

FIRST DEPARTMENT, SEPTEMBER TERM, 1879.

not defeat that right. It will be impossible for this board of commissioners to defeat the right to the elective franchise in this city by their neglect or failure to perform the duty of appointing inspectors within the time prescribed. A failure of that kind would simply subject them to a process of the court to compel them immediately to make the selection the law requires, and such selection would have the same effect made after October first, as though made before, because the law will not tolerate the idea that the failure of duty on the part of an administrative or executive officer shall defeat a popular right. Therefore, it may be understood, as well by the public as by the board of commissioners, that if the appointments are not made before the first of October, this court will not hesitate to entertain an application for a *mandamus* returnable *instanter* to compel the performance of that duty, so that there shall be no failure of any election to be held in the city. But we are compelled, in our view of the law, to deny the present application, for this reason : The law has appointed these officers to discharge certain official duties, it has prescribed the time within which the duties are to be performed. Within that period their power of performance is as perfect on one day as on another. The question now arising is in law no different than it would have been if the same motion had been made on the second or any other day in August, or the second or any other day in September. The board of commissioners, in short, have until the first day of October to perform their duty. The papers before us show that they have, at their various meetings, been attempting, in the way in which they have chosen to act, to perform their duty. Now, if the papers showed that the board refused to act at all, or refused to convene for the purpose of acting, then clearly it would be our duty to grant a *mandamus* to put the board in motion and compel them to meet and act under the law. The board has taken no such ground. It has simply failed because of the inability of the commissioners among themselves to agree and decide upon what men or class of men shall be appointed. They have reached a point, it is true, where, if they adhere obstinately to their present line of action, there will be a failure to appoint ; but the court cannot assume that a board of officers,

charged with certain duties, will adhere to wrongful action, or to any particular line of action during the whole time within which they are required to perform those duties. We must assume, on the contrary, that the board will, within the period prescribed, do its duty. That is the legal presumption, and we have no reason, that operates in law as an absolute conclusion, to suppose that this board will not proceed and make the appointments, selecting their appointees, under the construction that the court thinks ought to be given to the law, that is, taking from the body of the democratic party good men and true, without regard to local organizations or divisions. Between this and to-morrow night the board may wholly change its views and make selections in accordance with these suggestions. They have a perfect right to that period, and therefore a writ of *mandamus* would be improperly issued prior to the expiration of that time. But as I have already said, with the concurrence of my brethren, we shall not hesitate, if the board fails in its duty, to set them in motion at the expiration of the period fixed by law."

The members of the board of police differed as to the construction to be given to this opinion. Two inspectors for each district, selected from the list submitted by the republican organization, were appointed, and one inspector selected from the list submitted by the Irving Hall democracy was appointed, but the board were unable to agree upon the selection of the fourth inspector, two commissioners claiming it should be taken from the list submitted by Tammany Hall and the other two refusing to accede thereto. On the application of the same relators, an order was made on October 1, 1879, returnable at a General Term, to be held on October second, requiring the respondents to show cause why they should not be compelled to appoint one additional inspector of election from each district in the city as required by law.

After the hearing of the arguments of counsel and due deliberation the court, by Davis, P. J., delivered the following oral opinion :

" The court, in this case, have reached a unanimous conclusion as to the true construction of the law, and as to the duty of the board of police in executing it.

"We had occasion the other day to express our opinion of the construction of the law, to the effect that in the appointment of the representatives of the majority party in the board of inspectors of election, it was the duty of that board to consider the dmocratic party as an entirety, with a view only to its relations to the democracy of the State, without respect to its relations to local organizations. We still have no doubt that that is the true construction of the law, and that it was the duty of the board in selecting the inspectors, who represent the majority party, to have secured to the democracy, as a whole, a just and fair representation. The policy of the law was to secure such representation as would secure fairness in the election and honesty in the count and the returns ; and, for that purpose, it was intended that the representation of the majority party should not be limited to factions in that party, but fairly extended to the whole. Since the construction given by the opinion of the court pronounced on that occasion, the board have proceeded to take further action. They have appointed, in conformity with their duty, the representatives of the minority party, and all questions touching that representation are therefore eliminated from the case. They have not proceeded in respect to the representatives of the majority party, in conformity with the opinion pronounced by the court. On the contrary, they have appointed, as it now appears, from a section or faction of that party, without considering the party as a whole, one inspector for each election district. In making that appointment only one-third, or in round numbers, 30,000 democrats of the city (referring to the divisions between these organizations at the last election), have been allowed any representation or consideration whatever.

"Two-thirds are, without representation in these appointments, except as to a few members that have since been appointed. It was the duty of the board in making the selection to have given representation to the whole — that is to say, to have selected from the combined local organizations proper and fit men, without regard to their sectional or local associations. But these appointments have been made, and it is not in the power of the court, by this process, to interfere with them. There are left a large number of districts in which the fourth inspector remains yet to

be appointed. What in fairness, and in common justice ought to be done in respect to that inspector?

" The court think unanimously that it was the duty of the board, after having taken such action as was taken to secure to the minority of the majority party inspectors of election, representing them to the extent of one in each district, under a fair construction of the law for the purpose of securing representation to the whole body of the majority party, to have proceeded and selected the remaining inspectors from the organization known as the Tammany democracy.

" While we are of opinion, without any dissent or doubt, that that is the true construction of the law and ought to be carried out, we have nevertheless been unable to agree among ourselves with unanimity as to the form of the order that should be issued. We all concur that a *mandamus* should issue in the case.

" As to its form some doubts are entertained by members of the court, and that question will be reserved for the further consideration of the court until it again convene at the adjourned hour to-morrow. But we thought it proper to express the views at which we have arrived on the main and material questions of the case for the purpose, if possible, of inducing the board of commissioners to terminate this unpleasant and extremely exciting controversy, which, in our judgment, is after all of no real practical value.

" We have, therefore, thought it best to announce at this time our conclusions of law and our view of the duty of the board, trusting that the board will proceed at their session to-morrow morning to carry out a construction of the law which will, we think, commend itself to every intelligent and unbiased mind.

" If that shall unfortunately not be the case the court will be compelled, of course, to issue such writ as we may be able to agree upon to effectuate the general scope of the decision now announced.

" The court will, therefore, stand adjourned until eleven o'clock to-morrow morning."

On the coming in of the court at the adjourned hour the following oral opinion was delivered by BARRETT, J. :

552   THE PEOPLE ex rel. VAN WYCK v. WHEELER

First Department, September Term, 1879.

"The difficulty, and the only difficulty in the mind of the court, was as to the power by *mandamus* to remedy the evil complained of.   We were mindful of the well settled rule of law that while it was within the power of the court to direct a subordinate body to act, it was not within its power to direct the manner in which it should act.   We were very clear that we could not interfere with the proper exercise of the discretion of the board. On the other hand, we did not doubt that we had the power to construe the law in question, and that it was the duty of the board, in good faith, to exercise its discretion in the light of that judicial construction.   How, then, to enforce our construction, and yet to leave the board perfectly free in the exercise of its legitimate discretion, was the question.

I find from an examination of the cases to which the learned counsel for the corporation referred us, that the courts have limited the discretion of subordinate bodies so far as to keep them within the line of judicial construction.

For instance, in the *Case of the Assessors* (*Howland* v. *Eldridge*) to which reference has been made (43 N. Y., 457), the court held that while it was not competent to compel the assessors to make a particular affidavit, it had, in the language of Mr. Justice GROVER, the power to compel them to proceed and examine the evidence, and determine the fact, and, if from their determination it appeared that a certain consent had been given, to make an affidavit in accordance therewith.

So in the case of *The People ex rel. Opdyke* v. *Brennan* (39 Barb., 651), there was a difference of opinion between the mayor and the comptroller as to what the law meant ; the mayor claiming that it meant four daily papers having the largest circulation anywhere, and the comptroller that it meant four daily papers having the largest circulation in the city.   The court at Special Term ordered the comptroller to join with the mayor in designating four papers having the largest circulation anywhere, and named them.   The General Term, however, held that while it was competent to tell the mayor and comptroller that the law meant four daily papers having the largest circulation anywhere, and not merely in the city of New York, yet it was not competent for the court to name the particular papers.   It was for the court

to construe the law, and for the officers to determine the fact under such construction. The order was, therefore, modified so as merely to require the mayor and comptroller to meet and select the four daily papers having the largest circulation anywhere. The law was settled for their guidance, and they were bound in good faith to consider the evidence and then determine which were the papers coming within the construction.

So, in the case of *The People ex rel. Francis* v. *The City of Troy*, lately decided by the Court of Appeals (MSS. op. Sept. 16, 1879), the true rule is stated to be as laid down in *The People ex rel. Opdyke* v. *Brennan.*

It seems to me, therefore, as the result of these authorities that it was our duty to construe the law under which this board was acting, and that it was their duty in good faith (not seeking to evade our construction, but loyally to give it effect) to exercise their discretion in the light of such judicial construction and within the prescribed limits.

That being so, what remains ? We construed the law on a prior occasion. We held that it meant a selection of two inspectors of election for each district from the entire body of the democratic voters in the county of New York. We held that that was the intention of the Legislature and the true meaning of the act, and we instructed the board to proceed upon that basis. In thus deciding, we did not instruct the board to select particular persons. On the contrary, we left their discretion absolutely free. To have attempted to specify the persons who should be selected would, in my judgment, have amounted to usurpation of the legitimate functions of the board.

It was our province to instruct them to select from a class, construing the law so as clearly to define the class, and then leaving them the fullest exercise of discretion in the selection from such class.

How, then, did they obey ? Not by selecting two inspectors for each district from the (we will say in round numbers) 90,000 democratic voters in the county of New York, but by selecting one in each district exclusively from a section representing, we will say, in round numbers, some 30,000 of these voters.

They have necessarily, therefore, excluded from all consideration the remaining section, consisting of some 60,000 voters.

What is our duty under these circumstances? Clearly to enforce our original construction and instruction. And how, in the present position of affairs, is that to be done practically? If the board had as yet appointed no inspectors from the majority party in the county, then I apprehend our duty would have been limited to directing them to select two from the entire majority party without regard to factions or sections. But that is now impracticable, inasmuch as the board has ignored our suggestions and appointed so far exclusively from one faction or section. In consequence of this course, there is no practical method left of enforcing our original construction (as was said by the presiding justice last night), except to require the board to select the other inspector from the section that remains. One section has been exclusively considered, and is represented — as evidenced by the action of the board; the other section has not been considered and is entirely unrepresented.

The papers before us show conclusively that these two sections constitute the entire majority party in the city and county. If that be not so, in fact, there was ample opportunity for denial. It comes to this. We instructed the board to select from one great class. They failed to do this. They divided this great class into two classes. They gave one of such classes representation. We now say that they must do likewise for the other. Thus, and thus alone, can the great class originally contemplated receive full consideration and representation. We cannot now permit the selection of the remaining inspector from the entire body, otherwise the board might choose again to exclude the unrepresented section. On the contrary, the logic of the position, which the board has made for itself, necessitates our limiting them to the unrepresented class.

We do not, however, interfere with their discretion in selecting from this class. We do not say that they shall appoint 778 persons named by any one. Their judgment is open, free, unbiased; but they must exercise it in good faith, in the spirit of submission, and not that of evasion.

We simply tell them that out of this large remaining class they must exercise their honest judgment and make the selection. When that is done the entire majority party in this county will be represented; the law, as we construe it, will be enforced; and yet the judgment of these commissioners will not, in the slightest degree, have been fettered."